```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                            :
AMANDA THOMPSON,                            :   Case. No. 1:14-CV-1197
                                            :
         Plaintiff,                         :
                                            :
    v.                                      :   OPINION & ORDER
                                            :   [Resolving Doc. 44]
CITIZENS NATIONAL BANK, et al.,             :
                                            :
         Defendants.                        :
                                            :
-------------------------------------------------------
```

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On June 3, 2014, Plaintiff Amanda Thompson filed a complaint against Defendants Citizens National Bank, Skidmore "Camm" Garrett, and Philip Bethune.[1] With her complaint, Plaintiff alleges breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, conversion, civil conspiracy, and negligence claims.

Defendants Citizens National Bank ("CNB") and Skidmore "Camm" Garrett move for summary judgment.[2] For the following reasons, this Court **GRANTS** Defendant CNB and Garrett's motion for summary judgment as to Plaintiff's breach of fiduciary duty and negligence claims, and **GRANTS** Defendant Garrett's motion as to the breach of the covenant of good faith and fair dealing. This Court **DENIES** Defendant CNB's motion as to the breach of contract and breach of the covenant of good faith and fair dealing claims, and **DENIES** both Defendants' motion for summary judgment as to the conversion and conspiracy claims.

---

[1] Doc. 1. Plaintiff amended her complaint twice. Docs. 8, 12. On August 21, 2015, Judge Lesley Wells of this Court granted Philip Bethune's motion to dismiss for Plaintiff's failure to allege plausible grounds for relief. Doc. 21.
[2] Doc. 43. Brief in support. Doc. 44. Plaintiff opposed. Doc. 46. Defendants replied. Doc. 49.

Case No.14-cv-1197
Gwin, J.

## I. Factual Background

Plaintiff Thompson claims that Defendant CNB and her financial advisor, Defendant Garrett, conspired to drain her bank accounts without her knowledge. The alleged scheme involved moving large amounts of money from a restricted trust account to an account that allowed Thompson's ex-husband to drain the account. Plaintiff's ex-husband Bethune and CNB employee Garrett were college friends and Plaintiff's ex-husband allegedly steered the placement of the trust account to Garrett's financial firm despite its small size and location in a small town far distant from Plaintiff Thompson.

Plaintiff Thompson and Defendant Bethune were married when they decided to open a long-term agency account.[3] On December 29, 1999, Plaintiff signed an Agency Account Agreement with Defendant CNB.[4] Defendant Garrett, a financial advisor at CNB and college friend of Defendant Bethune, signed the Agency Account Agreement on behalf of CNB.[5] The Agency Account Agreement allowed for amendment by "mutual consent of the parties hereto in writing," and termination by "either party upon thirty (30) days written notice to the other party."[6]

On January 3, 2000, over $1 million was transferred to the fund.[7] After significant monies had been placed in the Agency Account and eighteen months after the Agency Account was established, on May 24, 2001, Plaintiff executed the "ACB 2001 Trust." Plaintiff Thompson said it was her intention that all assets be transferred to the ACB trust.

---

[3] Doc. 46 at 1; *see* 46-2 at 42:6-9.
[4] Doc. 12 ¶¶ 14, 15.
[5] *Id.* ¶ 17.
[6] *Id.* ¶ 18.
[7] Doc. 44 at 3 (citing Doc. 12 ¶ 1; Deposition of Amanda Thompson); Doc. 46 at 2 (citing Doc. 46-2 at 41:17-24).

Case No.14-cv-1197
Gwin, J.

The ACB 2001 Trust appointed three trustees—the Plaintiff, CNB employee Garrett, and David B. Hehn. David Hehn is a Nevada financial advisor who Plaintiff Thompson's father had recommended. Disbursements from the ACB 2001 Trust required at least two trustees' approval. Plaintiff Thompson alleges she intended the trust assets be used for her children and she believed the ACB 2001 Trust would control and protect her assets, including the Agency Account.[8]

Within a week of the establishment of the ACB 2001 Trust, CNB and Garrett transferred the ACB 2001 Trust assets to a different trust providing lesser protection of Thompson's assets.

On June 1, 2001, an Amendment to the Agency Account converted the Agency Account into a separate trust account, the "Calfee Trust."[9] Plaintiff alleges that her signature was forged on the Amendment that converted her Agency Account to the "Calfee Trust."[10]

The Calfee Trust had been created in October 1998 and had existed before both the Agency Agreement with CNB and the ACB 2001 Trust. Importantly, in contrast to the ACB 2001 Trust, the Calfee Trust did not require multiple trustee approvals for distributions. Under the Amendment converting the Agency Account into the Calfee Trust, Plaintiff was named the sole Trustee, CNB was the investment agent, and Defendant Garrett was the signor on behalf of CNB.[11] Only Plaintiff's signature was needed to make withdrawals from the Calfee Trust.

Plaintiff Thompson generally argues that the significant money transfers to the Calfee Trust—a week after the ACB 2001 Trust was established—made no sense. The Calfee Trust had existed for years but had never been funded. Why would Plaintiff Thompson go through the

---

[8] Doc. 12 ¶ 21. The "ACB Trust" is also referred to as the "Nevada Trust."
[9] *Id.* ¶ 25. Plaintiff had never used the Calfee Trust after executing it in 1998.
[10] *Id.* ¶ 28.
[11] *Id.* ¶¶ 26-27.

-3-

Case No.14-cv-1197
Gwin, J.

expense of creating the ACB 2001 Trust and funding it with more than $1 million, only to transfer the money to the less protected Calfee Trust a week later?

Plaintiff says that from January 30, 2001 through July 18, 2003, approximately $1.127 million were distributed and/or disbursed from Plaintiff's Agency Account and/or Calfee Trust.[12] From December 1999 through March 11, 2013, Plaintiff alleges that she never authorized or saw monthly statements or requests for authorization of a withdrawal, distribution, or disbursement from her Agency Account or the "Calfee Trust."[13]

In September 2004, the account was closed with a zero balance. However, Plaintiff never received notice of amendment or termination of the Agency Account Agreement.[14]

Plaintiff alleges that many or all of the distributions or disbursements were paid directly into Mr. Bethune's personal bank accounts and used to pay his debts.[15] Plaintiff says that Defendant Garrett effected some of the distributions or disbursements by indicating Plaintiff's verbal authorization.[16]

On or about February 23, 2012, Plaintiff requested her June to September 2001 account records from Defendants Garrett and CNB.[17] On or about February 24, 2012, Defendant Garrett sent the requested documents.[18] In October 2012, Plaintiff requested all records related to her account.[19] On or about March 11, 2013, CNB produced what it considered the complete records

---

[12] *Id.* ¶ 33.
[13] *Id.* ¶ 30-31.
[14] *Id.* ¶ 19.
[15] *Id.* ¶ 35.
[16] *Id.* ¶ 36. Plaintiff denies ever giving verbal authorization. *Id.* ¶ 37.
[17] *Id.* ¶ 40.
[18] *Id.* ¶ 41.
[19] *Id.* ¶ 42.

-4-

Case No.14-cv-1197
Gwin, J.

associated with Plaintiff's account.[20] At that time, Plaintiff discovered that her account had been closed in September 2004 with a zero balance.[21]

*Procedural History*

On June 3, 2014, Plaintiff filed this lawsuit against Defendants CNB, Garrett, and Mr. Bethune.[22] On August 21, 2015, Judge Wells granted Mr. Bethune's motion to dismiss all claims against him.[23] The same day, Judge Wells denied Defendants CNB and Garrett's motion to dismiss for lack of personal jurisdiction, and alternative motions to dismiss for improper venue and for transfer of venue.[24]

On June 27, 2016, Defendants moved for summary judgment on all claims.[25] Defendants also supplemented their motion for summary judgment, arguing that Plaintiff Thompson should be dismissed from the case and replaced by the trustee in her bankruptcy proceeding.[26] Plaintiff opposed Defendants' supplementary arguments,[27] and moved to join the bankruptcy trustee as a plaintiff.[28] On September 16, 2016, the Court granted Plaintiff's motion to join the trustee.[29]

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[30] The moving party must first demonstrate that there is an absence of a genuine dispute as

---

[20] *Id.* ¶ 43. Plaintiff argues that the records were missing numerous monthly account statements and distribution/disbursement authorizations. *Id.* ¶ 44-45.
[21] *Id.* ¶ 46.
[22] Doc. 1. Plaintiff filed her second amended complaint on August 26, 2014. Doc. 12.
[23] Doc. 21.
[24] Doc. 22.
[25] Doc. 43. Brief in Support. Doc. 44. Plaintiff opposes. Doc. 46. Defendants replied. Doc. 49.
[26] Doc. 59. Brief in Support. Doc. 60.
[27] Doc. 61. Defendants replied. Doc. 65.
[28] Doc. 62. Defendants opposed. Doc. 64. Plaintiff replied. Doc. 67.
[29] Doc. 68.
[30] *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 580 (6th Cir. 2014) (quoting Fed. R. Civ. Pro. 56(a)).

-5-

Case No.14-cv-1197
Gwin, J.

to a material fact entitling it to judgment.[31] Once the moving party has done so, the non-moving party must set forth specific facts in the record—not its allegations or denials in pleadings—showing a triable issue.[32] The existence of some doubt as to the material facts is insufficient to defeat a motion for summary judgment.[33] But the Court views the facts and all reasonable inferences from those facts in favor of the non-moving party.[34]

When parties present competing versions of the facts on summary judgment, a district court adopts the non-movant's version of the facts unless the record before the court directly contradicts that version.[35] Otherwise, a district court does not weigh competing evidence or make credibility determinations.[36]

### III.  Discussion

Defendants argue that Plaintiff Thompson's claims are controlled by the UCC and are untimely under the UCC. If Thompson's claims were displaced by the UCC, a one-year statute of repose—as opposed to longer statutes of limitations[37]—would apply to Thompson's claims.

#### A. Article 4A does not displace Plaintiff's common law claims.

Defendants first argue that Plaintiff's claims are displaced by the UCC. Plaintiff responds that claims based on activity "beyond the scope of Article 4A" are not displaced by the UCC.

Article 4A of the UCC governs commercial wire transfers. It contains a one-year statute of repose, which provides:

> If a receiving bank has received payment from its customer with
> respect to a payment order issued in the name of the customer as

---

[31] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[32] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[33] *Id.* at 586.
[34] *Killion*, 761 F.3d at 580 (internal citation omitted).
[35] *See Scott v. Harris*, 550 U.S. 372, 380 (2007).
[36] *Koren v. Ohio Bell Tel. Co.*, 894 F. Supp. 2d 1032, 1037 (N.D. Ohio 2012) (citing *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 470 (6th Cir. 2012)).
[37] The parties agree that Ohio statute of limitations laws apply. Doc. 46 at 4; Doc. 44 at 8.

Case No.14-cv-1197
Gwin, J.

> sender and accepted by the bank, and the customer received notification reasonably identifying the order, the customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the bank of the customer's objection to the payment within one year after the notification was received by the customer.[38]

When UCC Article 4A applies to common law claims, the UCC displaces those common law claims.[39]

The Sixth Circuit has summarized Article 4A as "address[ing] situations where a receiving bank fails to comply with the sender's order . . . resulting in either a delay in payment to the beneficiary . . . noncompletion of the funds transfer . . . or issuance of a noncompliant payment order."[40] UCC Article 4A displaces claims arising from the "mechanics of the wire-transfer process."[41] The court also cited with approval *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,[42] which held that "[f]or Article 4A purposes, the critical inquiry is whether its provisions protect against the type of underlying injury or misconduct alleged in a claim."[43]

Defendants argue that all of Plaintiff's claims are solely predicated on the allegedly unauthorized wire transfers and are therefore displaced.[44] Plaintiff responds that her claims go beyond Article 4A's scope.[45] This Court agrees with Plaintiff.

Defendants themselves previously characterized the bulk of Plaintiff's claims far more broadly than improper wire fund transfers:

> Defendants allegedly unilaterally converted Plaintiff's investment account into a trust account; Defendants allegedly forged

---

[38] Ohio Rev. Code Ann. § 1304.83.
[39] *Wright v. Citizen's Bank of E. Tennessee*, 640 F. App'x 401, 407 (6th Cir. 2016).
[40] 640 F. App'x at 408 (internal citations omitted). In *Wright*, the Sixth Circuit analyzed Tennessee's UCC Article 4A, which is essentially identical to Ohio's statute on point. Thus, the same analysis applies.
[41] *Id*. at 409.
[42] 597 F.3d 84, 87, 89–90 (2d Cir.2010).
[43] 640 F. App'x at 406.
[44] Doc. 44 at 9.
[45] Doc. 46 at 4.

Case No.14-cv-1197
Gwin, J.

> Plaintiff's signature or failed to authenticate her signature; Defendants allegedly falsely represented that Plaintiff orally consented to withdrawals and distributions from her account . . . Defendants allegedly failed to keep Plaintiff informed about account activity and failed to provide her with statements; and inter alia, Defendant CNB failed to train employees and put in safeguards to prevent unauthorized transfers. [46]

Although Defendants' actions allegedly led to or concealed the wire transfers, the transfers themselves are not the sole basis of Plaintiff's claims. Instead, "the type of underlying injury or misconduct alleged in [Plaintiff's] claim[s]"[47] exceeds that covered by Article 4A.

Most central to Plaintiff's claims, Plaintiff says she had established the ACB 2001 Trust with a multiple trustee approval requirement to protect from unauthorized disbursements.[48] In transferring monies to the Calfee Trust that did not have multiple trustee protections, Plaintiff says Defendants circumvented a central ACB 2001 Trust protection.[49]

Defendant Garrett knew that Plaintiff Thompson established the ACB Trust on May 24, 2001[50] and understood that the ACB Trust was meant to protect her assets.[51] It makes little to no sense that Plaintiff Thompson would move her assets from the ACB Trust to the Calfee Trust one week later, thereby forfeiting the ACB Trust's majority signature protection. Plaintiff's forged signature on the Agency Account Amendment—which excluded her money from the ACB Trust and moved it to the Calfee Trust[52]—is the central "misconduct alleged in her claim."[53]

---

[46] Doc. 14 at 3.
[47] *Wright*, 640 F. App'x at 406 (quoting *Ma*, F.3d at 87, 89–90).
[48] Doc. 46 at 8. Plaintiff understood the ACB Trust to protect her assets "by requiring the approval of two of three trustees before an asset could be withdrawn."
[49] *See id*. Only Plaintiff's signature was needed to make withdrawals from the Calfee Trust.
[50] *See* Doc. 46-3 at 120:15-24.
[51] *Id.* at 124:8-18.
[52] Doc. 46 at 2.
[53] 640 F. App'x at 406.

Case No.14-cv-1197
Gwin, J.

The allegations in Plaintiff's second amended complaint further demonstrate that UCC displacement is not appropriate here. While Plaintiff argues that each wire transfer breached the Agency Agreement,[54] her breach of contract claim goes beyond that argument. For example, Plaintiff argues that CNB breached by "forging Plaintiff's signature[s] and/or failing to confirm" their validity, and by "falsely representing that Plaintiff orally consented to withdrawals [or] distributions."[55] The breach of contract claim is broader than the wire transfers themselves.

 Plaintiff cites the same conduct to support her breach of fiduciary duty and breach of covenant of good faith and fair dealing claims.[56] Those claims also fall outside Article 4A.

The conversion and conspiracy claims center on Defendants' alleged plan to "fraudulently convert Plaintiff's CNB account funds."[57]  Forging Plaintiff's signature on the Agency Account Amendment—an act outside of Article 4A's scope—opened the door for the later wire transfers.

Plaintiff Thompson's allegations supporting her negligence claim[58] largely mirror the negligent and/or intentional misrepresentation claim that the Sixth Circuit found to fall outside of Article 4A's scope in *Wright*.

In *Wright,* the plaintiff brought a negligent and/or intentional misrepresentation claim based on the bank's Vice President's assurance that the bank had "trained, experienced personnel who could execute wire transfers" properly.[59] The Sixth Circuit found that claim to fall outside Article 4A: "Article 4A does not address representations made by a bank representative about the bank personnel's training, experience, or ability to perform wire transfers."[60]

---

[54] Doc. 12 ¶ 51 (arguing that "[e]ach wrongful distribution" from her account was an independent breach of contract).
[55] *Id*. ¶ 50.
[56] *Id*. ¶ 56, 62.
[57] *Id*. ¶ 76.
[58] Doc. 12 ¶84.
[59] *Wright*, 640 F. App'x at 410.
[60] *Id.*

Case No.14-cv-1197
Gwin, J.

Here, Plaintiff alleges that the bank failed to "put in place policies and procedures to safeguard the funds Plaintiff had entrusted to it, adequately train and/or supervise its employees, agents, directors, and officers in their dealings with Plaintiff and her account, verify or corroborate the distributions/disbursements made from Plaintiff's account, verify that Plaintiff was receiving account statements, and intervene and prevent unauthorized and wrongful transfers from Plaintiff's account."[61] Like in *Wright*, these allegations are not covered by Article 4A.

The allegations supporting Plaintiff's claims concern conduct "distinct and independent"[62] from the wire transfers. Therefore, allowing those claims to go forward does not "create rights, duties and liabilities inconsistent with those stated in [Article 4A]."[63]

### B. Timeliness

Because Plaintiff Thompson's claims are not displaced by Article 4A, the one-year statute of repose does not apply. The statutes of limitations vary among Plaintiff's common-law claims.

**1. Plaintiff's breach of contract and breach of covenant of good faith and fair dealing claims are timely against CNB, but cannot proceed against Defendant Garrett.**

Plaintiff Thompson's breach of contract claim is controlled by a 15-year statute of limitations.[64] Plaintiff's claim is timely even if the statute of limitations began to run at the earliest possible date suggested in this case.[65]

---

[61] Doc. 12 ¶ 84.
[62] *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 223–24 (4th Cir. 2002) (finding plaintiff's claims to fall outside Article 4A where defendant bank allowed an account to be improperly opened, failed to discover improper use of the account, and failed to train its staff to recognize fraud).
[63] Doc. 44 (quoting Ohio Rev. Code Ann. § 1304.52 off. cmt).
[64] Ohio Rev. Code Ann. § 2305.06. On June 26, 2012, the statute of limitations for breach of contract claims changed to 8 years. However, if a breach of contract claim accrued prior to June 26, 2012, the 15-year statute of limitations still applies. *See, e.g.*, *Transp. Ins. Co. v. Busy Beaver Bldg. Centers, Inc.*, 969 F. Supp. 2d 875, 885 n.17 (S.D. Ohio 2013) (citing S.B. 224 at § 3).
[65] In the Order dismissing Mr. Bethune, Judge Wells found that Plaintiff should have discovered the missing funds when she moved her assets into the ACB Trust in May 2001. Doc. 21 at 11. Plaintiff filed well before May 2016.

Case No.14-cv-1197
Gwin, J.

"Ohio law does not recognize a stand-alone claim for breach of the implied covenant of good faith and fair dealing."[66] Instead, the claim is viable only where there is an underlying breach of contract claim.[67] Ohio courts thus find that when a breach of the covenant of good faith and fair dealing attaches to a written contract, the 15-year breach of contract statute of limitations applies.[68] Because Plaintiff alleges breach of its written Agency Account Agreement with CNB,[69] her breach of good faith and fair dealing claim against CNB is also within the statute of limitations.

The claim against Defendant Garrett for breach of the covenant of good faith and fair dealing, however, necessarily fails. Because there is no breach of contract claim against him,[70] there can be no breach of the covenant of good faith and fair dealing.[71] Defendant Garrett is therefore entitled to summary judgment on that claim.

### 2. Plaintiff's breach of fiduciary duty and negligence claims are barred by the statute of limitations.

Plaintiff argues that her breach of fiduciary duty and negligence claims are subject to a four-year statute of limitations that runs "from the date the tortious activity is, or should have been, discovered."[72] In other words, Plaintiff argues that she is entitled to the benefit of the discovery rule.

---

[66] *Frisch v. Nationwide Mut. Ins. Co.*, 553 F. App'x 477, 482 (6th Cir. 2014).
[67] *Id*.
[68] *Walton v. Residential Fin. Corp.*, 905 N.E.2d 1307, 1309–10 (Ohio Ct. App. 2009) (citing *Thompson v. Kerr*, 555 F.Supp. 1090, 1096 (S.D. Ohio 1992)) ("To the extent [a breach of the duty of good faith and fair dealing] claim exists, a plaintiff may proceed under the 15–year statute of limitations for contract claims.").
[69] Doc. 12 ¶ 50.
[70] *Id*.
[71] *Frisch*, 553 F. App'x at 482.
[72] Doc. 46 at 11 (citing Ohio Rev. Code Ann. § 2305.09; *Inv'rs REIT One v. Jacobs*, 546 N.E.2d 206, 206-207 (Ohio 1989)). Plaintiff argued in her brief that negligence claims fall under a two-year statute of limitations. *Id*. General negligence claims, however, fall under § 2305.09's four-year statute of limitations. *Inv'rs REIT One*, 546 N.E.2d at 210.

Case No.14-cv-1197
Gwin, J.

"Ordinarily, a cause of action accrues and the statute of limitations begins to run at the time the wrongful act was committed."[73] However, "[u]nder the discovery rule, the statute of limitations begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered a possible cause of action."[74]

The discovery rule does not apply, however, to negligence or breach of fiduciary duty claims.[75] The statute of limitations on these claims therefore began to run "at the time the wrongful act was committed."[76] The last allegedly unauthorized wire transfer occurred on July 18, 2003.[77] The statute of limitations tolled well before Plaintiff Thompson filed her complaint on June 3, 2014.[78] Therefore, this Court grants Defendants' motion for summary judgment on the breach of fiduciary duty and negligence claims.

### 3. There is a genuine dispute of material fact as to whether Plaintiff Thompson's conversion and conspiracy claims are timely.

A claim for conversion is also subject to a four-year statute of limitations.[79] In Ohio, civil conspiracy is not an independent cause of action.[80] Instead, it is based on the "underlying

---

[73] *Collins v. Sotka*, 692 N.E.2d 581, 582 (Ohio 1998).
[74] *Doe v. Archdiocese of Cincinnati*, 849 N.E.2d 268, 273 (Ohio 2006) (citing *O'Stricker v. Jim Walter Corp.*, 447 N.E.2d 727 (Ohio 1993)).
[75] *Inv'rs REIT*, 546 N.E.2d at 211 (finding that while Ohio Rev. C. § 2305.09 "expressly provid[es] a discovery rule for certain actions . . . no such rule was extended to general negligence claims"); *Union Sav. Bank v. Lawyers Title Ins. Corp.*, 946 N.E.2d 835, 844 (Ohio Ct. App. 2010) (citing *Hirschl v. Evans*, No. 94 C.A. 43, 1996 WL 146090 at *3 (Ohio Ct. App. Mar. 27, 1996) (finding *Inv'rs Reit* to mean "that the discovery rule does not apply to [breach of fiduciary duty] claims").
[76] *Collins*, 692 N.E.2d at 582.
[77] Doc. 12 ¶ 34.
[78] Doc. 1.
[79] *See Inv'rs REIT One*, 546 N.E.2d at 211.
[80] *See Palmer v. Westmeyer*, 549 N.E.2d 1202, 1207 (Ohio Ct. App. 1988) (citing *Minarik v. Nagy*, 193 N.E.2d 280, 280 (Ohio Ct. App. 1963) ("Conspiracy allegations add nothing further to a plaintiff's action other than the underlying wrongdoing that is the basis of the conspiracy."); *see also Transition Healthcare Assoc., Inc. v. New London Healthcare*, 2012 -Ohio- 3411, ¶ 25, 2012 WL 3061861, at *8 (Ohio Ct. App. July 27, 2012) (finding that the Ohio Supreme Court "quoted with apparent approval the rule that an underlying unlawful act is required before a civil conspiracy claim can be successful").

-12-

Case No.14-cv-1197
Gwin, J.

wrongdoing that is the basis of the conspiracy."[81] Thus, the four-year statute of limitations for conversion also applies to Plaintiff's conspiracy claim.[82]

Different from negligence and breach of fiduciary duty claims, Plaintiff's conversion and conspiracy claims are subject to the discovery rule.[83] The question is when Plaintiff "discover[ed] or, in the exercise of reasonable care, should have discovered the complained-of injury."[84]

Plaintiff argues that "the evidence . . . could lead a reasonable juror to conclude that Plaintiff's discovery [in March 2013, when CNB produced a full set of records for the account] was timely."[85] This Court agrees.

Defendants argue that Plaintiff must have had notice on multiple occasions before March 2013.[86] First, Defendants cite the July 15, 2004 Separation Agreement between Plaintiff and former Defendant Bethune.[87] Defendants reason that at the time of the Separation Agreement, Plaintiff made representations about her financial interests and never mentioned the account. Defendants argue that Plaintiff's failure to list the ACB 2001 Trust shows she knew it had been drained and closed.[88] Second, Defendant argues that Plaintiff knew about the ACB 2001 Trust's

---

[81] *Id.*
[82] *Cully v. St. Augustine Manor*, No. 67601, 1995 WL 237129, at *4 (Ohio Ct. App. Apr. 20, 1995).
[83] Ohio Rev. Code Ann. § 2305.09 (If the action is for . . . the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered."); *see also Inv'rs REIT One*, 546 N.E.2d at 211
[84] *Inv'rs REIT One*, 546 N.E.2d at 210. Defendants argue
[85] Doc. 46 at 16.
[86] In Judge Well's order dismissing Philip Bethune from this case, she found that Plaintiff Thompson would have reasonably discovered some of the transfers as early as May 2001 when she moved funds from the Agency Account into the ACB Trust. Doc. 21 at 11. Defendants argue this Court is bound to agree with Judge Wells under the case doctrine. Doc. 44 at 16; Doc. 49 at 7. But "[t]he law-of-the-case doctrine does not remove a district court's jurisdiction to reconsider, or otherwise preclude a district court from reconsidering, an issue previously decided in the case." *U.S. v. Dunbar*, 357 F.3d 582, 593 (6th Cir.2004), *vacated on other grounds*, 543 U.S. 1099 (2005). This Court declines to follow Judge Well's ruling.
[87] Doc. 44 at 11.
[88] *Id.*

-13-

status as early as 2002 when CNB sent out statements and tax forms to Plaintiff's correct address that would have notified her of the transfers.[89]

Plaintiff responds that the 2004 Separation Agreement does not establish that she discovered, or should have discovered, the improper withdrawals. She states that she did not reflect the ACB 2001 Trust on the divorce disclosures because she did not believe the account was subject to the Separation Agreement.[90] She says the account and trust assets were for her children's benefit.[91]

Plaintiff also argues that the 2002 tax documents did not provide notice. She states that (1) she never saw these tax forms at the time, and (2), even if she had, the forms would not have notified her to any improper withdrawals.[92] For all distribution categories—nontaxable, cash liquidation, and noncash liquidation—the tax form at issue shows "$0.00."[93] Even if Plaintiff had seen this tax form, those numbers would not indicate, or propel her to investigate, the wire transfers in this case.

Under the summary judgment standard, Defendants must show that there is *no genuine dispute* as to any material fact. Here, there is a genuine dispute as to whether Plaintiff discovered, or reasonably should have discovered, the transfers to and from the Calfee Trust before March 2013 when she received the full account statements.

Defendants' arguments that the Separation Agreement and/or account statements and tax forms should have lead Plaintiff to discover her injury are speculative. Plaintiff has pointed to

---

[89] *Id.* at 13.
[90] Doc. 46 at 18.
[91] *Id.* (citing Docs. 46-2 (Thompson deposition); 44-4 (Separation Agreement); 46-3 (Garrett deposition)). Plaintiff also asserts that she relied on her lawyer to properly list her assets. *Id.*; *see also* Doc. 44 at 11 (citing Thompson deposition, 46-2 at 75:12-76:3).
[92] *Id.* at 19.
[93] Doc. 44-8.

Case No.14-cv-1197
Gwin, J.

specific facts in the record demonstrating a "genuine issue for trial."[94] A reasonable juror could find that Plaintiff did not discover her injury until March 2013.[95] In that case, Plaintiff Thompson satisfied § 2305.09's statute of limitations by filing in June 2014. Therefore, Defendants are not entitled to summary judgment on the conversion and civil conspiracy claims.

## IV. Conclusion

For the reasons above, this Court **GRANTS** Defendant CNB and Garrett's motion for summary judgment as to Plaintiff's breach of fiduciary duty and negligence claims, and **GRANTS** Defendant Garrett's motion as to the breach of the covenant of good faith and fair dealing. This Court **DENIES** Defendant CNB's motion as to the breach of contract and breach of the covenant of good faith and fair dealing claims, and **DENIES** both Defendants' motion for summary judgment as to the conversion and conspiracy claims.

IT IS SO ORDERED.

Dated: September 20, 2016              *s/        James S. Gwin*
                                        JAMES S. GWIN
                                        UNITED STATES DISTRICT JUDGE

---

[94] *Matsushita*, 475 U.S. at 587.
[95] *See ReAmerica*, 2008 WL 7811571 at *6 (finding no genuine dispute of whether Plaintiff had actual notice of wire transfers where receipt of account statements and "[Plaintiff's] own deposition confirm[] that he had actual notice").